UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | No. 12-cv-1094 |
| Plaintiff, | ) | |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | |
| | ) | |
| THE CITY OF HARVEY, a municipal corporation, ROBERT BUCHANAN, and, ANDREW JOSHUA, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| ------------------------------------------------------ | | |
| | ) | |
| JANE DOE II and JANE DOE III, | ) | |
| | ) | No. 12-cv-2069 |
| Plaintiffs, | ) | |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | |
| | ) | |
| THE CITY OF HARVEY, a municipal corporation, and ANDREW JOSHUA, | ) ) | |
| | ) | |
| Defendants. | ) | |
| ------------------------------------------------------ | | |
| | ) | |
| JANE DOE IV, JANE DOE VI, JANE DOE VII, and JANE DOE VIII, | ) ) | |
| | ) | No. 14-cv-8424 |
| Plaintiffs, | ) | |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | |
| | ) | |
| THE CITY OF HARVEY, a municipal corporation, | ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs sued the City of Harvey and its Police Department ("HPD"), alleging that HPD maintained a policy of discrimination against female victims of sexual assault in violation of 42

U.S.C. § 1983 and the Equal Protection Clause. Jane Does I, II and III also allege that Andrew Joshua ("Joshua"), HPD's former Commander of Investigations and Chief of Police, individually and in his official capacity violated their rights under the Equal Protection Clause by allegedly mishandling their sexual assault cases. Jane Doe I further asserts claims against HPD and Joshua for violation of her rights under 42 U.S.C. § 1983 and the Due Process Clause for allegedly placing her in increased danger of being sexually assaulted by Robert Buchanan ("Buchanan"); 42 U.S.C. § 1985, conspiracy to deprive her of rights and privileges; and state law claims for fraudulent concealment and violation of the Illinois Domestic Violence Act, and assault and battery against Buchanan, a private citizen. Discovery has closed with respect to Does I, II, III, and IV and the trial for these plaintiffs is scheduled for May 20, 2015.

On March 16, 2015, defendants HPD and Joshua ("defendants") moved for summary judgment on all counts asserted by Does I, II, III and IV. At a status hearing on April 13, 2015, the Court advised the parties that defendants' fully briefed motion would be taken under advisement and considered as a motion for directed verdict upon the close of plaintiffs' case at trial, given the proximity of the trial date and what appeared to be a great deal of factual issues. At the hearing the Court also advised that after the motion was fully briefed it would consider other means of resolving the motion where appropriate. The motion was fully briefed on April 27, 2015. Upon review of the parties' arguments and evidence and supplemental briefing on the issues of qualified immunity and the legal standards for plaintiffs' Equal Protection and Due Process claims, the Court will decide certain issues and reserve others per its previous order. For the reasons stated herein, defendants' motion for summary judgment on Joshua's qualified immunity defense as to Does I, II, and III's claims, and Doe I's Due Process and Illinois Domestic Violence Act claims is granted.

**Background**

The following facts are undisputed. Joshua was Commander of Investigations for HPD in 1997. In 2003, he was appointed Chief of Police, until he retired on October 12, 2007. (Pls. 56.1 Resp. ¶ 1.)

On August 3, 1997, Doe I's mother Teresa Buchanan ("Ms. Buchanan") reported to the HPD that Doe I had been sexually assaulted by Buchanan. That night, Ms. Buchanan took Doe I to the hospital where a sexual assault kit was collected. (Pl. 56.1 Resp. ¶ 2.) Joshua was the detective assigned to Doe I's case on August 4, 1997. (*Id.* ¶ 3.) On August 5, 1997, Joshua took Doe I and Ms. Buchanan to La Rabida Children's hospital so that a counselor could conduct Doe I's Victim Sensitivity Interview. Also present for the interview were an assistant state's attorney from the Cook County State's Attorney's Office ("CCSAO") and a social worker from the Illinois Department of Children & Family Services ("DCFS"). (*Id.* ¶ 4.) Doe I described the sexual abuse inflicted on her by Buchanan. Joshua found Doe I's statements to be credible and determined that Buchanan would be arrested. (*Id.*; Def. 56.1 Resp. ¶ 106.)

The DCFS social worker interviewed Ms. Buchanan who explained during the interview that she was not going back to live at the home she shared with Buchanan and would never live with Buchanan again. (Pl. 56.1 Resp. ¶ 5.) On August 6, 1997, per Joshua's order Buchanan was arrested at the home he shared with Ms. Buchanan and Doe I. (*Id.* ¶ 8.) Joshua released Buchanan on August 7, 1997. Joshua did not take a buccal swab for DNA from Buchanan while he was in custody. (*Id.* ¶¶ 9, 10.)[1] Buchanan never fully moved out of the home he shared with

---

[1] Interestingly, it appears that the motivating factor to treat Doe I's case differently, if any, is that Buchanan was in law enforcement at the time of Doe I's report and his arrest. As plaintiffs mention: "Robert Buchanan testified that he believed that his position as a Cook County Correctional Officer may possibly have had some type of bearing on how he was initially treated. Robert Buchanan testified, 'Well, my feeling is, had I not been in law enforcement, maybe they would have put the pedal to the

Doe I. (*Id.* ¶ 11.)

On August 6, 1997, an HPD evidence technician delivered Doe I's sexual assault evidence kit to the Illinois State Police Division of Forensic Sciences ("ISP") for processing. (*Id.* ¶ 7.) On September 8, 1997, an ISP call note indicates that Joshua called ISP and asked that Doe I's rape kit be processed ASAP and to call him with the results. A September 10, 1997, call note indicates that Joshua was notified that semen had been identified in Doe I's sexual assault evidence kit. (*Id.* ¶ 12.) Joshua did not seek felony review for the charges against Buchanan. (*Id.* ¶ 16.)

On October 31, 1997, DCFS social worker Margo Cralle ("Cralle") interviewed Joshua who stated that Buchanan would be arrested and instructed DCFS not to interview Buchanan prior to the arrest. (*Id.* ¶ 28.) That same day, Cralle made an attempt to contact Buchanan. At this time Joshua believed Buchanan to be living at his mother's home, a different residence from Doe I and Ms. Buchanan. (*Id.*) On November 3, 1997, Cralle wrote an interview note from an interview with a redacted source that stated, "No proof perp (Buchanan) is in the home after ask to leave by [Police Department] and DCFS." (*Id.* ¶ 31.) Later that day, Cralle conducted in-person interviews of Ms. Buchanan and two of Doe I's siblings at their home. (*Id.* ¶ 32.) On November 4 and 19, Cralle followed up on Doe I's condition, speaking with representatives from La Rabida hospital, Ms. Buchanan and Doe I's therapist. (*Id.* ¶ 34.) As of November 4, 1997, DCFS did not find it necessary to take Doe I into protective custody or to seek court intervention for custody. (*Id.* ¶ 38.)

Sometime in the summer of 1998, Buchanan began sexually assaulting Doe I again until 2004 when she moved to Atlanta. Doe I did not report the sexual assaults that began in 1998 to

---

metal. Maybe they would have forced me to this swab. I agreed, but there was no order.'" (Pl. 56.1 Add'l Facts ¶ 108.)

HPD or DCFS. At the time of these assaults, she felt like she had no other options because she had already gone to her mother and she had already gone to "the last line of defense," the HPD. (*Id.* ¶ 18.)

Doe II was assaulted in her home on May 24, 2007, by an acquaintance, Jacquez Dunbar ("Dunbar"). (Pl. 56.1 Resp. ¶ 52.) Doe II called HPD to report the assault and was told that she would have to wait for her mother to make a report. Doe II's mother, Tammy Brown ("Ms. Brown") called the HPD later that day and HPD police were dispatched. The officer took notes, wrote a report, interviewed Doe II and Ms. Brown and called an ambulance. Doe II gave the officer the name and description of Dunbar. Doe II was taken to the hospital by ambulance where a rape kit was administered. The kit was submitted to ISP on June 15, 2007, for processing. (*Id.* ¶ 53.) Dunbar was arrested on June 15, 2007. HPD's Detective Jeffrey Crocker investigated Doe II's case. That day, Crocker brought Doe II and Ms. Brown to the police station where, among other things, they spoke to assistant state's attorney Desiree Berg, a female attorney from the CCSAO. (*Id.* ¶ 54.) They told her that Doe II's medical exam revealed vaginal and anal tearing and that she bled after the assault. (*Id.* ¶ 55.) That same day Detective Crocker questioned Dunbar in Berg's presence; Dunbar admitted that he had sex with Doe II, but claimed it was consensual. Berg then interviewed Doe II again. (*Id.* ¶ 54.) Berg told Ms. Brown that it was a "he-said-she-said" situation, that Doe II was "too calm," and that she did not believe that Doe II had been raped. (*Id.* at ¶ 56.) Joshua was present for this meeting but did not say anything. Doe II and Ms. Brown were upset after the interviews with Berg and believed that the case was over at that time. (*Id.* ¶ 57.) Dunbar was released and Berg did not approve felony charges. (*Id.* ¶ 58.)

Doe III was sexually assaulted on April 28, 2008, and on May 15, 2008. (Pl. 56.1 Resp.

¶¶ 63, 73.) Joshua was retired from HPD at the time of Doe III's sexual assault. As Chief of Police from 2003 to 2007, Joshua was responsible for hiring and retaining HPD personnel, including the detective assigned to Doe III's April 2008 case, Detective Eric Armstrong. (Def. 56.1 Resp. ¶ 76; Pl. 56.1 Resp. ¶¶ 63, 64.) Armstrong was hired in August 2004. (Pl. Ex. 25, HPD30891.) At the time of his hire, Joshua believed that something unusual came up in Armstrong's background check, that "he was involved with the domestic." (Pl. Ex. 28, HPD 25903.)

The April 28, 2008, assault occurred at Doe III's school by an acquaintance, Michael Nichols. (*Id.* ¶¶ 63, 64.) On the day of the assault Armstrong interviewed the school's assistant principal and Nichols. (*Id.* ¶¶ 64, 65.) Nichols stated that he believed the sexual encounter with Doe III was consensual. (*Id.* ¶ 65.) Armstrong later released Nichols from custody and ordered him to appear at the Information Desk at Juvenile Court the next day. (*Id.* ¶ 66.) Armstrong filled out a Juvenile Information Sheet and requested CCSAO felony approval of the charge of criminal sexual assault against Nichols. (*Id.* ¶ 68.)

On April 29, 2008, Armstrong interviewed Doe III who described the sexual assault in detail, reiterating that the encounter was not consensual. (*Id.* ¶ 67.) Assistant state's attorney Nick DiAngelo interviewed Doe III and Nichols and ultimately declined to approve felony charges. Armstrong subsequently completed a Petition for Delinquency and requested that the CCSAO prosecute Nichols as a delinquent in juvenile court. (*Id.* ¶ 68.) The assistant state's attorney for the Juvenile Division called Armstrong regarding the case and indicated that she would speak to DiAngelo before deciding whether to pursue a finding of delinquency against Nichols. Armstrong did not submit Doe III's rape kit for testing in 2008 on his belief that the identity of the alleged assailant was known and that he admitted to sexual intercourse with Doe

III. (*Id.* ¶ 69.)

On April 11, 2012, Doe III's rape kit was submitted to ISP for testing. (*Id.* ¶ 70.) The DNA profile taken from the sperm found on Doe III's vaginal swabs matched the DNA profile of a third person, Marlon Minter. (*Id.*) Armstrong informed Doe III of the match to Minter and showed her a photo array of six photos, one of which was Minter. Doe III could not identify Minter from the photo array. Armstrong told Doe III to contact him if she wanted to pursue her case. Doe III did not pursue her case and did not contact Armstrong. (*Id.* ¶ 71.)

**Legal Standard**

Summary judgment is appropriate if the evidence shows that there is "no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment has the "initial responsibility" to show that there is no genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986), but the Court must view all facts and make all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). The Court may enter summary judgment only if the record as a whole establishes that no reasonable jury could find for the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

**Discussion**

*1. Qualified Immunity*

Qualified immunity protects government officials from individual liability for actions taken while performing discretionary functions, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). An officer is entitled to qualified immunity

7

where: (1) the facts the plaintiff has alleged or shown demonstrate that the conduct of the officer violated a constitutional right, and (2) the right was clearly established at the time of the alleged violation. *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815-16, 172 L.Ed.2d 565 (2009)). A court has discretion to consider either part of the test first. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014).

A plaintiff bears the burden of establishing that the constitutional right was clearly established. *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013). Although the plaintiff need not point to a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011). In other words, "the plaintiff must demonstrate either that a court has upheld the purported right in a case factually similar to the one under review, or that the alleged misconduct constituted an obvious violation of a constitutional right." *Lunini v. Grayeb*, 395 F.3d 761, 769 (7th Cir. 2005).

Defendants argue that Joshua is entitled to qualified immunity with respect to plaintiffs' Equal Protection and Due Process claims because the evidence is contrary to a finding of a constitutional violation. They further contend that he is entitled to immunity from Doe I's Due Process claim because she fails to demonstrate that the alleged constitutional right she claims was violated was clearly established in 1997. The Court agrees.

There is no question that the Equal Protection Clause of the Fourteenth Amendment prevented Joshua from engaging in arbitrary gender-based discrimination when he was employed by the HPD from 2003 to 2007. *See* U.S. Const. Amend XIV, § 1; *Nanda v. Moss*, 412 F.3d 836, 844 (7th Cir. 2005) ("It has been plain in this circuit for quite some time that arbitrary gender-

based discrimination ... violates the equal protection clause."). Although the right is clearly established, Joshua is entitled to qualified immunity unless Doe I can establish a violation of her equal protection rights. She must present evidence that she is a member of a protected class, she is otherwise similarly situated to members of the unprotected class, and she was treated differently from members of the protected class. *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005). Further, a plaintiff is required to establish that she has been the victim of intentional discrimination. *Hildebrandt v. Ill. Dep't of Nat. Resources*, 347 F. 3d 1014, 1037 (7th Cir. 2003). She must offer evidence that the defendants "acted with a nefarious discriminatory purpose … and discriminated against her based on her membership in a definable class." *Doe v. Galster*, 768 F.3d 611, 622 (7th Cir. 2014). Finally, a plaintiff must produce evidence that the defendant directly participated in the constitutional deprivation or there must at least be a showing that he "acquiesced in some demonstrable way" in the alleged violation. *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003).

If true, the facts alleged are alarming. However, plaintiffs have presented no evidence that Joshua (or any of the defendants) treated them differently than any similarly-situated males and therefore fail to establish a prima facie case of an equal protection violation. *See Hoskins v. City of Milwaukee*, 259 Fed. Appx. 868, 870 (7th Cir. 2008); *Bauers v. Bd. of Regents of Univ. of Wis.*, 33 Fed. Appx. 812, 815 (7th Cir. 2002). Indeed, the record reveals that plaintiffs had access to case files and statistics for male sexual assault victims, but chose not to present them for comparison.

Further, viewed in the light most favorable to plaintiffs, the facts and evidence do not demonstrate that Joshua acted with a nefarious discriminatory purpose due to the Does' gender. Plaintiffs argue that Joshua intentionally discriminated against them because: he failed to

9

properly investigate Doe I's case; he was active Chief of Police at the time of Doe II's report of sexual assault and when HPD failed to obtain her medical exam; he hired Detective Armstrong, who was assigned to Doe III's April 2008, knowing that his background check turned up an instance of a domestic issue; and he was Commander of Investigations and was informed of the sexual assault when Doe IV's report was made. This record does not establish that Joshua's conduct violated a constitutional right. The Does' status as females does not support an allegation of gender-based discrimination under the equal protection clause; they each must demonstrate that Joshua "acted with discriminatory purpose." *Chavez v. Illinois State Police*, 251 F.3d 612, 645 (7th Cir. 2001) (citing *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S. Ct. 1756, 95 L.Ed.2d 262 (1987)). Because plaintiffs have failed to demonstrate that Joshua's conduct violated a constitutional right, the Court finds that Joshua is entitled to qualified immunity with respect to their Equal Protection Claims.

Regarding Doe I's Due Process claim, the issue is whether the right Doe I alleges was violated was clearly established at the time of the alleged violation. *See Hardaway*, 734 F.3d at 743. Doe I's claim is asserted under the "state-created danger" exception to the rule that a state's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause. *DeShaney v. Winnebago County Dep't of Soc. Services*, 489 U.S. 189, 197, 109 S. Ct. 998, 103 L.Ed.2d 249 (1989). The state-created danger exception is a narrow one and applies only where the state creates or increases danger to an individual. *Hernandez v. City of Goshen, Ind.*, 324 F.3d 535, 538 (7th Cir. 2003); *Paine v. Cason*, 678 F.3d 500, 510 (7th Cir. 2012). "When courts speak of the state's 'increasing' the danger of private violence, they mean the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence." *Sandage v. Bd. of Comm'rs*, 548 F.3d

10

595, 600 (7th Cir. 2008). The cases where the Seventh Circuit has either found or suggested that liability attached under the state-created danger exception are "rare and often egregious." *Estate of Allen v. City of Rockford*, 349 F.3d 1015, 1022 (7th Cir. 2003).

Doe I claims that Joshua (and thereby HPD) placed Doe I in increased danger during his investigation because he did not, of his own accord, secure an order of protection for her, instructed DCFS to delay its interview of Buchanan, failed to secure a DNA sample from Buchanan, and failed to request felony review from CCSAO. Doe I claims that due to these alleged failures Buchanan had access to her and began sexually assaulting her again. Doe I's case, however, is not sufficiently similar to those cases where the Seventh Circuit has applied the state-created danger exception. *See, e.g.*, *White v. Rochford*, 592 F.2d 381, 382 (7th Cir. 1979) (police arrested a driver for drag racing and left the children passengers stranded alone in the car on a busy highway on a cold night); *Reed v. Gardner*, 986 F.2d 1122, 1127 (7th Cir. 1993) (police officers arrested a sober driver and left behind an obviously drunk passenger with the keys to the vehicle who later caused a collision); *Paine*, 678 F.3d at 511 (police arrested a woman in a safe place and released her in a hazardous one while she was unable to protect herself). In those cases, the police encountered a potential danger and turned it into an actual one, leaving the plaintiffs in positions worse than before the police acted.

The 7th Circuit recently considered this exception in *Doe v. Arlington Heights*, No. 14-1461, 2015 WL 1621398, at *5 (7th Cir. Apr. 13, 2015). While reasonable arguments can be made on both sides regarding the applicability of the exception in that fact scenario, the facts presented in Doe I's case are not as extreme. *Id*. at *1, 5-6 (officer responding to 911 call found intoxicated teenage female with three males allowed group to leave the scene together, reported to dispatch that subjects were not at scene upon his arrival, called off another responding officer

11

and female was subsequently sexually assaulted by one of the males). Nonetheless, on the facts here, the Court finds no reason to grant the exception.

This is not a case where Doe I was safe, or even considerably safer, before Joshua acted. His alleged investigative failures and failures to act did not turn a potential danger into an actual one. When Joshua's investigation began Doe I was not in a safe place; she was in actual danger already. Further, there is no way of knowing what would or could have happened if Joshua conducted his investigation differently. Accordingly, his conduct did not place her in a "worse position" than she would have been if he had not acted (or acted) at all. *DeShaney*, 489 U.S. at 201, 109 S. Ct. 998. Joshua had no constitutional duty to protect her, thus there is no clearly established right and he is entitled to qualified immunity. Moreover, because her Due Process Claim is based on Joshua's actions, which this Court has found cannot form the basis of a constitutional violation, summary judgment will be entered as to Doe I's Due Process claim against HPD. *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 596-597 (7th Cir. 1997).

*2. Illinois Domestic Violence Act*

Doe I claims that defendants violated the Illinois Domestic Violence Act ("IDVA"), which provides that when a law enforcement officer "has reason to believe that a person has been abused," the officer "shall immediately use all reasonable means to prevent further abuse." 750 ILCS 60/304. The IDVA contains a specific immunity provision which provides that a law enforcement officer's actions in enforcing the statute will not expose the officer or his employer to liability unless the act is the result of willful and wanton misconduct. 750 ILCS 60/205. Defendants argue that they are entitled to summary judgment because the statute's enforcement obligation provision does not impose a "general, open-ended duty to protect," citing *Lacey v. Village of Palatine*, 232 Ill. 2d 349, 364 (2009). Doe I does not dispute that *Lacey* controls,

rather she contends that her case is distinguishable because in *Lacey*, the investigation was closed when the victim's former boyfriend subsequently murdered her, and here, Doe I's case was "never closed" until recently when Buchanan pled guilty to sexual assault on May 2, 2013. She also argues that defendants are liable for the alleged harm she suffered from Buchanan's 1998 abuse because they failed to use reasonable means to prevent this abuse in the initial stages of the investigation, and any steps that they did take "triggered" further duties under the IDVA. The Court is not persuaded by Doe I's arguments.

The Supreme Court of Illinois stated in *Lacey* that the word "immediately" implies that the officer at the scene cannot delay in implementing reasonable means and also that "the officer is in a position proximate to the victim that can allow the officer to take reasonable steps to prevent further abuse." *Lacey*, 232 Ill. 2d at 366. The court concluded that while the IDVA assumes that at some point an officer will make direct contact with the victim to carry out the illustrative "reasonable steps," listed in the Act, "each of these reasonable steps is also of a limited duration, indicating that the Act envisioned some discrete, limited involvement by law enforcement officers and not an open-ended, general, or long-term duty to protect." *Id.* at 366-67. Based on the record and the undisputed facts above, the Court finds that Joshua immediately took reasonable steps to prevent further abuse when he was notified that Doe I had been sexually assaulted by Buchanan. Doe I provides no authority for her contention that the initial steps that Joshua took "triggered" any additional duties to protect beyond the immediate response required by the Act. Her trigger theory is contrary to the plain language of the Act as it "would create a situation where once officers were aware of the potential for violence, they would remain liable for the prevention of that violence for an indefinite period of time." *Id.* at 368. In any event, the Court finds that the record does not establish the willful or wanton conduct required for liability

to attach.  750 ILCS 60/205.  Accordingly, the Court finds that defendants are entitled to judgment as a matter of law.

**Conclusion**

For the foregoing reasons, defendants' motion for summary judgment affirming Andrew Joshua's qualified immunity defense as to Does I, II and III is granted.  Defendants' motion for summary judgment with respect to Doe I's Due Process and Illinois Domestic Violence Act claims is are granted.

      SO ORDERED.

                                                              _____
                                                             SHARON JOHNSON COLEMAN
                                                             United States District Judge

DATED:  May 7, 2015